Filed 8/14/14  In re D.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.T., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059491 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J246711 & J246712) |
| v. | OPINION |
| A.T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed with directions.

Katherine A. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

1

A.T. (mother), a developmentally disabled mother of two year-old A.T. and infant D.T., appeals from a finding made at the six-month status review hearing (Welf. & Inst. Code,[1] § 366.21) that the San Bernardino County Children and Family Services (CFS) provided reasonable services. The children were removed from mother's custody due to neglect related to mother's mild mental retardation, and mother received services through the Inland Regional Center (IRC). At the review hearing, the court found reasonable services had been offered or provided over mother's objection. The court extended mother's reunification services for an additional six months and mother appealed.

On appeal, mother argues (1) there is insufficient evidence to support the reasonable services finding, and (2) the court erred in finding that the Indian Child Welfare Act did not apply when it never inquired as to father's possible Indian ancestry. We remand to comply with ICWA procedures, but otherwise affirm.

### BACKGROUND

Because the father did not appeal, we limit our factual overview to matters relating to mother, except where necessary for context and clarity.

On November 1, 2012, a social worker made a home visit after receiving a report of general neglect and physical abuse as to three month-old D.T. and two year-old A.T. The social worker found D.T. crying because A.T. hit her on the head and hand; mother was unable to soothe the baby. Mother admitted she had smoked marijuana a few days

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

earlier. The maternal grandmother lived in the house to assist mother, but was reported to drink to excess and bring men to the home.

The great-grandmother, who arrived during the social worker's visit, informed the social worker that mother did not watch the children because she was always using her phone to send text messages to men to invite them to come over, mother hit A.T., and that both children had scabies.[2] Mother denied the children had scabies, but showed the social worker a rash covering a large area on D.T.'s chin. The social worker learned mother received Supplemental Security Income (SSI) because she is developmentally delayed, and her mother lived with her for assistance.

The social worker returned to mother's home a few days later with a public health nurse. The baby's rash was worse, and the public health nurse attributed the baby's rash to someone feeding the infant by propping up the bottle rather than someone feeding her the bottle, which mother acknowledged doing. On this visit, the baby had red bumps on her torso, front and back, but mother did not know what they were. Mother did not appear to be bonding well with the baby.

When the social worker addressed these concerns with mother, mother became defensive and insisted they were all lies. Insofar as there had been four prior referrals regarding the family, the social worker became concerned that mother's mental capacity

---

[2] Scabies is a contagious infestation of the skin caused by a particular itch mite. (Taber's *Cyclopedic Medical Dictionary* (20th ed., 2005) p. 1945, col.2.) Apparently, D.T. did not actually suffer from scabies.

3

put the safety of the children at risk. Mother identified Michael M. as the father of D.T., and Arthur C.[3] as the father of A.T.

At a risk assessment meeting, the decision was made to detain the children because the baby's condition was worse and because of mother's drug use. The social worker returned to mother's residence with a warrant and a police officer to detain the children, and discovered the electricity had been turned off due to mother's nonpayment of the bill.

On November 7, 2012, dependency petitions were filed as to each child under section 300, subdivision (b). As to mother, the petition alleged she has a substance abuse problem (allegation b-1), an "unsafe lifestyle,"[4] lack of knowledge and parenting skills placing the children at risk (allegation b-2), that mother suffered from mental health issues that affect her ability to parent (allegation b-3), and that she failed to get proper medical care for the children (allegation b-4). At the detention hearing, mother and the then alleged father of D.T. submitted completed ICWA-020 forms. Mother claimed no Indian ancestry, but alleged father Michael M. indicated he might have Indian heritage.

---

[3] Father of A.T. was referred to as Arthur throughout the proceedings. However, when he testified at the contested jurisdictional-dispositional hearing, he identified himself as Victor Angel C. We will refer to him as Arthur, or A.C.

[4] The 1987 amendment to Section 300 was intended to replace the former statute with more specific and narrowly drawn requirements that would eliminate the wide discretion given to courts and child welfare workers under the old provisions. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 821.) Although no one demurred, an allegation that a parent has "an unsafe lifestyle" is vague, as is the term "mental health issues."

4

Arthur C. was not present at that hearing. The children were detained together in the home of the maternal great-grandmother.

Prior to the jurisdictional hearing, CFS submitted a report. The report noted that biological testing excluded Michael M. as the father of D.T., and recommended that he be made a nonparty. Mother named another man, V., whose last name she did not know, as the alleged father of D.T., and an amended petition was filed naming this potential father. The report also noted that mother was a client of Inland Regional Center (IRC) due to her developmental delay, which made it difficult for mother to understand directions, communicate her thoughts, and manage both children simultaneously. The social worker noted that mother's alleged drug use was limited to a single occasion when she experimented with marijuana, and that mother had submitted samples for drug testing, which proved to be negative.

The report observed that mother had raised her children for a significant time without CFS intervention, and she had an income and stable housing, as well as family support from the maternal grandmother and great-grandmother. Because mother was cooperative and receptive to CFS, the social worker was optimistic about mother's prospects for reunification, despite her difficulty learning and remembering. The report noted that mother had cognitive limitations and her lack of judgment made her allow "unsavory[5] people" come into and out of her home. The social worker recommended

---

[5] "Unsavory" is defined as not savory, insipid, tasteless; unpleasant to taste or smell; disagreeable, distasteful, or morally offensive. (Webster's *Third New World International Dictionary* (1993), p. 2509, col.1.) Greater precision in terms would aid the

*[footnote continued on next page]*

more effective parenting education for parents with intellectual disabilities. CFS also provided an in-home school teacher for the maternal great-grandmother, so the relative caretaker would learn how to redirect A.T., who exhibited aggressive and negative behaviors.

On December 20, 2012, mother waived her trial rights and entered a no contest plea to the petition to allegation b-2 of the petition, that mother's "unsafe lifestyle" and lack of knowledge and parenting skills placed the children at risk. However, Arthur C., the alleged father of A.T., requested a contested hearing. That same day, CFS submitted a non-appearance review packet informing the court that the maternal great-grandmother requested that A.T. be removed from her home because of her extreme and aggressive behavior, which included hitting, pinching, and hair-pulling. The packet indicated that A.T. was developmentally delayed in several areas, such as motor skills and language. A.T. was placed in an IRC home deemed able to meet her needs.

On January 24, 2013, the court concluded the jurisdictional hearing, dismissing allegations b-1, b-3, and b-4 as to mother, entering a true finding only as to allegation b-2. The court found the two children came within the provisions of section 300, declared the children to be dependents, and removed custody from the parents. Mother submitted on the recommendation for services, indicated she had only two parenting classes left, was receiving services through IRC, and had an assisted living partner to help her get

reviewing court in determining the nature of the risks such persons posed with respect to the children.

6

housing. The court approved the reunification plan and ordered mother to participate. The court also found that the Indian Child Welfare Act (ICWA) did not apply.

On July 12, 2013, CFS submitted its six-month review report. The report recommended that services be terminated because mother had not taken advantage of the help provided, had minimally participated in services and had been uncooperative. During the reporting period, mother had been irresponsible with her SSI check and lost her bus passes. Mother's irresponsibility with money resulted in her eviction from her residence in May 2013 due to nonpayment of rent, so her in-home support person had to help her get a new place to live.

The report also noted that mother was pregnant with her third child, of which Arthur C. was alleged to be the father, although the parents denied having a romantic relationship. Additionally, mother had been terminated from her counseling sessions, provided through Catholic Charities, because she missed five sessions, although the therapist recommended that therapy be continued. The counselor reported that mother's mental retardation limited her ability to make sound judgment, and commented on mother's mood swings. The report did not indicate whether or not the counselor was familiar with counseling issues pertaining to developmentally delayed individuals.

On January 31, 2013, April 3, 2013, and on June 5, 2013, mother submitted drug tests upon demand, and the results for those tests were negative. However, mother missed two additional tests on May 10, 2013 and July 5, 2013, without a valid excuse.

Regarding mother's parenting, the report indicated she had completed parenting classes at Central Valley Regional Recovery Center, but was unable to demonstrate

7

parenting skills during visits. Instead, during visits mother interacted more with the social worker than with the children, and no bonding with the children was apparent, despite weekly visits. In June 2013, mother was offered visits at Making a Difference Association, an approved visitation center, where interactive visits are provided with a coach, to model appropriate parenting. However, visits were marginal and mother appeared to have no maternal instinct to those who supervised the visits.

In addition, the status review report revealed mother had been diagnosed with mild mental retardation, Attention Deficit Disorder, obesity, and anxiety disorder. IRC agreed to provide mother with services through a third party vendor, Pathways of Coyne & Associates, as well as Supportive Living Services, providing a minimum of 17 hours per month of training and "habilitation," which is not defined. By a plan dated December 19, 2012, IRC agreed to help mother maintain her residence, assist her with financial management and banking, and show her how to do comparison shopping, access health services for herself and her children, emergency procedures, as well as to help her to read and understand correspondence. The Supportive Living Agency actually provided 25 hours per month of supportive living services, assisting mother in enrolling in other outside classes, signing her up for Inland Behavioral Health for outside therapy.

During the reporting period, mother had several medical issues requiring her to spend time in the hospital for problems relating to knee pain, urinary tract infections, gallstones, anxiety, and her current pregnancy. The hospital stays resulted in missed visits and failure to complete services, as well as missed meetings with the social worker. The social worker, IRC worker and the Pathways worker expressed the opinion that

8

mother was making excuses and was not truly motivated to reunify with her children. However, there is no evidence mother was malingering.

On July 24, 2013, the court ordered the parents to drug test that day, and set the matter for a contested review hearing. The results of mother's drug test were positive for methamphetamine. The contested hearing was conducted on August 14, 2013. The court continued the children's dependent status, and maintained them in their respective placements. Mother's counsel objected to a finding that reasonable services had been provided, because the parenting class to which mother was referred was not a program designed for persons with developmental delays. The court found mother's progress was moderate, and extended her reunification services for an additional six months, while terminating father's services for minimal progress. The court amended the service plan to add the requirement that mother attend a perinatal program, which she had just commenced, four days per week, 28 hours per week, to teach her life skills, anger management, drug rehabilitation, and parenting. The court also added a requirement that the CAG[6] social worker be permitted to observe visits, but not interfere.

On August 22, 2013, mother timely appealed.

---

[6] The Child Advocacy Group (CAG) represented mother. The social worker to which the court referred may have been the IRC worker who attended the hearing, but that is not clear from the record.

DISCUSSION

*1. Substantial Evidence Supports the Reasonable Services Finding*.

Mother argues there is insufficient evidence to support the juvenile court's finding that CFS provided her with reasonable services. We disagree.

When a finding that reunification services were adequate is challenged on appeal, we review for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) In such cases, our review begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which supports the conclusion of the trier of fact. (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1158, citing *In re Alvin R., supra,* 108 Cal.App.4th at p. 971.) We review the evidence in the light most favorable to the prevailing party, indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691 (*Kevin R.*).)

With few exceptions, whenever a child is removed from a parent's custody, the court is required to provide services to the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a); *In re Jesse W.* (2007) 157 Cal.App.4th 49, 59, citing *In re Luke L.* (1996) 44 Cal.App.4th 670, 678.) The reunification plan must be appropriate to the parents' circumstances, and should be specific and internally consistent, with the overall goal of resumption of a family relationship. (*In re Luke L, supra,* citing *In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako R.*).) In other words, the juvenile dependency system is required to accommodate the special needs of

10

disabled and incarcerated parents.  (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1792.)

The adequacy of a reunification plan and the reasonableness of reunification efforts made by a child welfare agency are judged according to the circumstances of each case.  (*Kevin R., supra*, 191 Cal.App.4th at p. 691.)  To support a finding that reasonable services were offered or provided, the record should show that the agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult.  (*Ibid.*)  The standard is not whether the services provided were the best that might be provided in an ideal world, but, rather, whether the services were reasonable under the circumstances.  (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426 (*Tracy J.*), citing *In re Misako R., supra,* 2 Cal.App.4th at p. 547.)

Mother relies heavily on *In re Victoria M.* (1989) 207 Cal.App.3d 1317 (*Victoria M.*).  There the court there held that before the parental rights of a developmentally disabled parent can be properly terminated, the record must establish by clear and convincing evidence that services specially designed to meet the needs of the developmentally disabled have been explored that, despite the availability of such services, it is in the best interest of the children to be declared free for adoption.  (*Id.* at pp. 1320, 1330.)  However, in that case mother's disabilities were not considered in determining what services would suit her needs, and no accommodation was made for her special needs.

11

Mother also relies on *Misako R., supra,* 2 Cal.App.4th 538, where the mother was mildly retarded, and illiterate in both her native language, Korean, and in English. Her children were made dependents based on excessive discipline and the court issued a reunification order directing mother to cooperate with In-Home Services, as well as the Union of Pan Asian Communities Counseling (UPAC) and Treatment Center to learn new parenting skills. Several months after the disposition hearing, a psychological evaluation determined that the mother was mildly retarded. (*Id.* at pp. 542-543.)

In *Misako R.,* the social worker, with the aid of a UPAC counselor, visited with mother once or twice per week, attempted to teach her basic skills such as shopping, cooking, paying bills, using public transportation and proper methods of disciplining her children. (*Misako R., supra,* 2 Cal.App.4th at p. 543.) The mother visited the San Diego Regional Center for the Developmentally Disabled, but was uncooperative. (*Ibid.*)

On appeal, the mother asserted that the services offered were not reasonable given her intellectual deficiencies and language difficulties, relying on the reasoning of *Victoria M..* (*Misako R., supra,* 2 Cal.App.4th at p. 545.) The reviewing court disagreed because not everyone was aware that the mother had mental limitations until well into the case. (*Id.* at p. 546.) As to the reasonableness of the services, the court noted that when the mother's mental impairment was discovered, she was referred to the Regional Center, but that mother insisted she did not need its services. (*Ibid.*) Thus, the reviewing court affirmed the reasonable services finding after reasoning that, "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best

that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Id*. at p. 547.)

In *Tracy J.*, *supra,* 202 Cal.App.4th 1415, both parents were developmentally disabled. In that case, the parents fully complied with their case plans but received only limited and supervised visits, and were not instructed on how to recognize their child's asthma symptoms and treat him appropriately, which undermined their ability to reunify. The parents were not informed about the child's medical appointments until they were over, and were not referred to a program that provided parenting instruction as well as independent living services to parents with disabilities.

Further, the mother was not offered or provided services designed to address her physical disabilities (obesity, complicated by having arms disproportionately short, which made it difficult to hold the child), which impeded her ability to care for a young child. Additionally, the evaluating psychologist had indicated that mother's presentation required ongoing assessment, but none was provided. (*Tracy J., supra,* 202 Cal.App.4th at pp. 1427-1428.) The reviewing court concluded that there was not substantial evidence to support the juvenile court's finding that reasonable reunification services were offered or provided.

The present case is easily distinguished from *Victoria M*. and *Tracy J*. Mother was provided numerous services through the IRC, including supportive living services to provide mother with training and help with maintaining the residency, managing finances, banking, shopping, health maintenance and medical issues for herself and the

13

children, accessing community services, reading and understanding correspondence, and learning emergency procedures. Mother was also provided with a "parent partner."

Mother completed parenting classes and received a certificate. Although mother complained at the six-month review hearing that the parenting class was not designed for parents with developmental disabilities, at the time of the disposition hearing, when the court ordered mother to complete the program, no request was made to find a parenting class specifically designed for regional center clients. To the contrary, at the disposition hearing, mother's counsel was optimistic that the children would be able to return to mother's care in six months because she had been involved in her counseling programs, had only two parenting classes left at that point, she was an IRC client and was receiving services through IRC, and had an assisted living partner helping mother to get housing. At that point, viewed prospectively, mother's counsel did not feel the parenting classes were inadequate. That opinion changed only when the six-month review report expressed the view that mother had not benefitted from parenting classes. Nevertheless, the court extended services to provide more intensive parenting instruction.

Mother also argued at the hearing that the case plan required an outpatient drug rehabilitation program if mother failed to test, and on appeal she urges us to find it was unreasonable to delay the referral to a drug program until just before the review hearing. However, the allegation of substance abuse was dismissed from the petition at the time of the jurisdiction hearing pursuant to a negotiated plea agreement. The drug treatment component of the case plan required mother to participate if she failed to test upon request. However, mother's drug tests had been negative prior to the missed tests, and

14

the only positive drug test was conducted on July 24, 2013, less than a month before the review hearing.

Mother received ample services designed to aid a parent with mother's limitations. They may not have been perfect or ideal, but they accommodated mother's special needs. The record supports the trial court's finding that reasonable services were provided.

2. *The Matter Is Remanded to Comply With ICWA Procedures*.

Mother and Michael M. (originally thought to be the alleged father of D.T.), submitted completed ICWA-020 forms to the court at the time of the disposition hearing. A.C., the biological father of A.T., did not. Nevertheless, the juvenile court made a finding that ICWA did not apply. On appeal, mother argues for reversal of the ICWA finding because there was no proper inquiry as to A.C.'s possible Indian ancestry. CFS concedes the lack of compliance with ICWA procedures prior to making the determination that ICWA did not apply.

Section 224.3, subdivision (a), and rule 5.481, subdivision (a) of the California Rules of Court impose upon both the juvenile court and the social services agency an affirmative and continuing duty to inquire whether a dependent child is or may be an Indian child. Rule 5.481, subdivision (a)(3), in particular, requires the court to order the parent to complete the "Parental Notification of Indian Status (form ICWA-020)." That was not done vis-à-vis A.C. Remand is ordered to comply with the mandates of ICWA.

**DISPOSITION**

We remand the matter to the juvenile court to comply with the provisions of ICWA. In all other respects, the judgment is affirmed.

15

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

RICHLI
J.

MILLER
J.